**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | NO.   07-258-1 |
| **LLOYD WASHINGTON, JR.,** | : | |
| a/k/a "Bub" | : | |
| | : | |
| **Defendant.** | : | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | NO.   07-258-5 |
| **GREGORY JONES,** | : | |
| a/k/a "G" | : | |
| | : | |
| **Defendant.** | : | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

RUFE, J.                                                                January 30, 2012

    Pending before the Court are timely post-trial motions seeking judgments of acquittal or a new trial filed by Defendants Lloyd Washington and Gregory Jones.  For the reasons that follow, the motions will be denied.


I.        **INTRODUCTION**

    In this case, five people were indicted on charges relating to a conspiracy to retrieve parcels containing cocaine from United Parcel Service ("UPS") Stores in Philadelphia, Pennsylvania, from May 2006 to February 2007.  At the conclusion of a jury trial, Washington and Jones were both convicted of one count of conspiracy to distribute five kilograms or more of

cocaine and one count of attempted possession with intent to distribute five kilograms or more of cocaine, and aiding and abetting the same. The jury found a third defendant, Ronald Crawford, not guilty of the same charges, as well as a firearms charge. Two other defendants pled guilty and testified at the trial. Both Washington and Jones argue that the trial evidence was insufficient to support a finding of guilt on either count of the superseding indictment and that certain evidence should not have been admitted at trial; Washington also argues that he should have been tried separately from Jones.


## II.     STANDARD OF REVIEW

Under Federal Rule of Criminal Procedure 33, the trial court may grant a new trial when there is a finding of trial error, including the introduction of prejudicial testimony, or when the trial court does not believe that the evidence supports the jury's verdict. A "district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred -- that is, that an innocent person has been convicted."[1]

In ruling on a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), the district court must view the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the evidence presented at trial.[2] In conducting the

---

[1] United States v. Davis, 397 F.3d 173, 181 (3d Cir. 2005) (internal quotations omitted). See also United States v. Brennan, 326 F.3d 176, 189 (3d Cir. 2006) (motions for a new trial based on the weight of evidence "are to be granted sparingly and only in exceptional cases").

[2] United States v. Boria, 592 F.3d 476, 480 (3d Cir. 2010); United States v. Cunningham, 517 F.3d 175, 177 (3d Cir. 2008); United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002).

sufficiency inquiry, a court does "not view the government's evidence in isolation, but rather, in conjunction and as a whole," and will draw all reasonable inferences in favor of the decision of the jury.[3]  "The fact that alternative inferences exist is irrelevant."[4]  The Court must sustain the jury's verdict if there is substantial evidence to uphold the decision.[5]  The prosecution may satisfy its burden entirely through circumstantial evidence.[6]  Under this particularly deferential standard of review, the Court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [the Court's] judgment for that of the jury."[7]  Accordingly, a finding of insufficiency should be "confined to cases where the prosecution's failure is clear."[8]

Notwithstanding this highly deferential standard, in a conspiracy case, the Court must "closely scrutinize the Government's evidence because (1) slight evidence of [a defendants's] connection to the conspiracy is not sufficient to support guilt, and (2) guilt must remain individual and personal."[9]  "Conspiracy cannot be proven 'by piling inference upon inference'"

---

[3]  United States v. Brodie, 403 F.3d 123, 134 (3d Cir. 2005). See also United States v. United States Gypsum Co., 600 F.2d 414, 417 (3d Cir. 1979) ("The character and effect of a conspiracy [is] not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.") (internal citation and quotations omitted).

[4]  Boria, 592 F.3d at 486 (Fisher, J., concurring) (citing United States v. Iafelice, 978 F.2d 92, 97 n.3 (3d Cir. 1992)).

[5]  United States v. Flores, 454 F.3d 149, 154 (3d Cir. 2006).

[6]  United States v. Mercado, 610 F.3d 841, 845 (3d Cir. 2010) (citing United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006)).

[7]  Brodie, 403 F.3d at 133.

[8]  Smith, 294 F.3d at 477.

[9]  Boria, 592 F.3d at 480 (citing Brodie, 403 F.3d at 134).

where those inferences do not logically support the ultimate finding of guilt.[10]

To prove conspiracy, the Government must show that there was "an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit the underlying offense."[11]   The alleged conspirators must share a "unity of purpose," the intent to achieve a common illegal goal, and an agreement to work together toward that goal.[12]   Together, these elements "incorporate a requirement that [the Defendants] had knowledge of the specific illegal objective contemplated by the particular conspiracy."[13]   The Government must establish these elements beyond a reasonable doubt.

Because "[s]ecrecy and concealment are essential features of successful conspiracy,"[14] the Government may satisfy its burden to prove each of these elements beyond a reasonable doubt through either direct or circumstantial evidence.[15]   But any inferences drawn must "have a logical and convincing connection to the facts established."[16]   The Third Circuit "forbids the upholding of a conviction of the basis of speculation."[17]

_____

[10] United States v. Coleman, 811 F.2d 804, 808 (3d Cir. 1987).

[11] Brodie, 403 F.3d at 134 (internal citation and quotations omitted).

[12] Boria, 592 F.3d at 481; United States v. Mastrangelo, 172 F.3d 288, 291 (3d Cir. 1999); United States v. Schramm, 75 F.3d 156, 163 (3d Cir. 1996) (illegality is an essential element); United States v. Kates, 508 F.2d 308, 311 (3d Cir. 1975) (there must be evidence that the defendant "knowingly entered into a conspiracy").

[13] See, e.g., Boria, 592 F.3d at 481; United States v. Cartwright, 359 F.3d 281, 287 (3d Cir. 2004); United States v. Idowu, 157 F.3d 265, 267 (3d Cir. 1998); United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997).

[14] Blumenthal v. United States, 332 U.S. 539, 557 (1947).

[15] Brodie, 403 F.3d at 134.

[16] Cartwright, 359 F.3d at 288.

[17] Thomas, 114 F.3d at 406.

4

In addition to conspiracy, Defendants were convicted of aiding and abetting possession with intent to distribute a controlled substance.  In order to prove the aiding and abetting charge, the Government was required to prove that Defendants (1) had knowledge of the drugs, (2) had knowledge that others intended to distribute the drugs, or (3) purposefully intended to aid others in the specific crimes alleged.[18]  Because the mental state required for this charge is identical to that required for conspiracy, the issue of whether the Government sufficiently provided evidence of "knowledge" is dispositive to both charges.[19]

## III.    TRIAL EVIDENCE

The evidence at trial, taken in the light most favorable to the prosecution, established the following.  On February 7, 2007, at approximately 8:00 a.m., Philadelphia Police Detective Timothy King received a call from Bill Mullen, a security specialist at a UPS sorting facility in Philadelphia.[20]  In the course of his duties, Mullen had examined and opened two UPS parcels

---

[18] See Boria, 592 F.3d at 481 n.8; United States v. Salmon, 944 F.2d 1106, 1113 (3d Cir. 1991) ("An aiding-and-abetting conviction requires that another committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it."); Cartwright, 359 F.3d at 287.

[19] See, e.g., Salmon, 944 F.2d at 1113 (acting with intent to facilitate the substantive offense requires that one acted with the "'intent to help those involved with a *certain* crime"); United States v. Wexler, 838 F.2d 88, 92 (3d Cir. 1988) ("It follows that the aiding and abetting conviction must fall for parallel reasons.  The crime of aiding and abetting requires a showing of intent to help those who are involved in a certain crime.  Because the government did not prove that Wexler had knowledge of the [drugs], had knowledge that [his co-defendant] intended to distribute or possess [drugs], or purposefully intended to aid others in committing the crime alleged, a reasonable jury also could not have had sufficient evidence from which to find that Wexler purposefully aided and abetted the possession and/or distribution of [drugs]." (internal citations and quotations omitted)); Cartwright, 359 F.3d at 287 ("[A] conviction on [an aiding-and-abetting] charge "requires that another committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it.").

[20] Notes of Testimony ("N.T.") 7/22/09 at 73-75, 93, 135.

that contained bricks of white powder, which he believed to be narcotics.[21]  The parcels were addressed to "Precision Global" and shipped to 211 South Street (a UPS Store) in Philadelphia from "Avatar International," purportedly located at 1435 Third Street Promenade in Santa Monica, California.[22]

After speaking with Mullen, Detective King drove an unmarked car to the 200 block of South Street to investigate the area.[23]  Detective King testified that he observed a silver Buick Rendezvous with its engine running near the store; Washington was one of two people inside the Buick.[24]  Detective King saw a UPS driver arrive at the UPS Store and enter at approximately 9:50 a.m., whereupon Washington walked up and down South Street, looked into the front cab of the UPS truck, looked into the UPS Store window, and circled the 200 block of South Street in the Buick approximately five times.[25]

At approximately 11:00 a.m., Detective King met with UPS security specialist Mullen at the UPS sorting facility at 15 East Oregon Avenue in Philadelphia.  Detective King testified that each parcel he examined contained a series of boxes and bags holding a total of 12 duct-taped bricks of compressed white powder.[26]  Detective King field-tested the white powder, which

---

[21] N.T. 7/23/09 at 4-7.

[22] N.T. 7/22/09 at 94.

[23] N.T. 7/22/09 at 75-76; 78-79.

[24] N.T. 7/22/09 at 79, 84-85; N.T. 7/27/09 at 5-6.  The other person in the car pled guilty and testified at trial.

[25] N.T. 7/22/09 at 84, 86-90; 92.

[26] N.T. 7/22/09 at 93, 96-100.

tested positive for the presence of cocaine.[27]  The Philadelphia Police laboratory later confirmed that the white powder was in fact cocaine, weighing approximately 23.7 kilograms.  After the field test, Detective King removed five bricks from the parcels and resealed them.[28]

Detective King, State Trooper Joseph Nigro, and Special Agent Joseph Hartman then took up surveillance positions along South Street near the UPS Store.[29]  At about 11:45 a.m., Mullen made a controlled delivery of the two parcels to the UPS Store.[30]  Approximately five minutes after the controlled delivery, Washington and his passenger returned in the silver Buick.[31]  The surveillance team observed Washington park at the corner of Second and South Streets and walk up and down South Street several times, looking inside each parked car he passed, as though conducting counter-surveillance.[32]  Next, Washington entered the UPS Store, emerged a few minutes later with a small white bag, and reentered the Buick.[33]  Washington then circled the 200 block of South Street several more times while looking into parked cars.[34]  Washington drove away, returning at approximately 2:03 p.m.[35]  During the time he was away

---

[27] N.T. 7/22/09 at 99-100.

[28] N.T. 7/22/09 at 101-102.

[29] N.T. 7/23/09 at 27-28; N.T. 7/24/09 at 14.

[30] N.T. 7/22/09 at 102.

[31] N.T. 7/22/09 at 103.

[32] N.T. 7/22/09 at 104-105.

[33] N.T. 7/22/09 at 104.

[34] N.T. 7/22/09 at 104; N.T. 7/27/09 at 9.

[35] N.T. 7/22/09 at 109; N.T. 7/27/09 at 10.

from South Street, Washington met one of the cooperating witnesses at a gas station.[36]  He later

met with another cooperating witness and Jones at the same gas station.[37]

At approximately 2:07 p.m., the surveillance team observed a taxi driven by Crawford,

with another defendant as passenger, park directly in front of the UPS Store.[38]  The passenger left

the taxi and entered the UPS Store, emerging a few moments later with one of the parcels, which

she placed in the trunk of the taxi.[39]  The passenger went back inside the Store to retrieve the

second parcel, placed it in the trunk as well, and then re-entered the taxi.[40]  The taxi drove to

Second Street, turned left, and pulled up directly behind Washington's Buick, which was parked

one block away at Second and Lombard Streets.[41]  The taxi followed Washington's car to

Delaware Avenue and onto northbound Interstate 95.[42]  Detective King and other officers, in both

marked and unmarked cars, followed the vehicles until they left the Interstate at the Girard

Avenue exit.  The officers stopped both cars and arrested Washington, Crawford, and the two

passengers.[43]  Detective King recovered the parcels from the trunk of the taxi.[44]  From the

passenger compartment of the Buick, the officers recovered several documents, including a

---

[36] N.T. 7/27/09 at 10-14.

[37] N.T. 7/27/09 at 12-14.

[38] N.T. 7/22/09 at 109.

[39] N.T. 7/22/09 at 110.

[40] N.T. 7/22/09 at 110; N.T. 7/24/09 at 18.

[41] N.T. 7/24/09 at 17-18.

[42] N.T. 7/22/09 at 111-12.

[43] N.T. 7/22/09 at 113-14.

[44] N.T. 7/22/09 at 117, 133.

receipt for items purchased from the UPS Store at 211 South Street earlier that day, business cards from other UPS Stores, and an Alamo car rental receipt showing that the Buick was rented by Washington's sister.[45]   The officers also recovered cell phones from Crawford and his passenger and two cell phones from Washington, which revealed multiple calls among Washington, the passenger, Crawford, and Jones that day.[46]

A cooperating witness, who was not criminally charged, testified that Washington had arranged for her and one of the cooperating defendants to open mailboxes at the South Street UPS store and another UPS store located at 1735 Market Street in Philadelphia on May 15, 2006.[47]   Witnesses testified that Washington coordinated several pick-ups of parcels of cocaine at the two UPS locations in the months leading up to his February 7, 2007 arrest.[48]   Washington would then break down the bricks of cocaine into smaller quantities at his sister's home.[49]   Washington also maintained an apartment where he kept cocaine and large amounts of cash; Jones routinely would stop by this apartment to pick up cash from Washington.[50]   The jury heard additional testimony regarding the pattern of phone calls among Jones, Washington, and others on February 3, 2007, and February 7, 2007, that corroborated Jones's and Washington's roles in

---

[45] N.T. 7/22/09 at 127-132.

[46] N.T. 7/22/09 at 122-25, 132; N.T. 7/24/09 at 20-39.

[47] N.T. 7/24/09 at 234-49.

[48] N.T. 7/27/09 at 17-19.

[49] N.T. 7/27/09 at 18-20.

[50] N.T. 7/27/09 at 21-24.

coordinating these parcel pick-ups.[51]

On August 27, 2008, approximately eighteen months after the arrests of the occupants of the Buick and the taxi, federal agents, acting pursuant to a valid arrest warrant, located Jones leaving the master bedroom of a residence in Mullica Hill, New Jersey.[52]  One of the agents escorted Jones back into the master bedroom immediately after he was taken into custody, and observed piles of cash in plain view around the bed.  The agent also saw a pair of cargo shorts on the bed with a large amount of cash sticking out of a pocket.[53]  The cash found in the bedroom totaled $14,400.[54]  At one point during the arrest, Agent Gerald Turner asked Jones if he needed to contact an employer to let him know that he would not be coming to work and Jones replied that he did not have a job.[55]  Some time later during the same arrest, Agent Turner, in the presence of another agent, asked Jones for permission to search the Mullica Hill residence, which Jones granted.[56]  The search revealed a staircase inside the closet of the master bedroom leading to an attic-like space, where agents found a small vinyl luggage bag and a shopping bag

---

[51] N.T. 7/27/09 at 185-87, 190-205.

[52] N.T. 7/27/09 at 206-07.  Jones was staying at the Mullica Hill residence with the owner's permission.

[53] N.T. 7/27/09 at 215.

[54] N.T. 7/27/09 at 215.

[55] N.T. 7/27/09 at 207-08.

[56] N.T. 7/27/09 at 208-09.  Before trial, Jones filed a motion to suppress evidence found during the search. The Court made findings of fact in denying the motion, including that Jones expressed concern that he would not be present during the search, that Agent Turner explained that Jones would see and be given a receipt for all evidence confiscated and removed from the residence, and that Jones then voluntarily consented to the search.  See Findings of Fact and Conclusions of Law on Motion to Suppress (June 12, 2009) [Document No. 275] at 5.

containing approximately $71,000 in cash.[57]  Under the suitcase and bag, the agents found three

greeting cards of a personal nature in envelopes addressed to "Greg."[58]  In Jones's wallet, the

agents also found business cards for South Street Mailbox Plus, two Enterprise rental car

locations in Philadelphia, and the Alamo rental car branch at the Philadelphia International

Airport.[59]  In addition, agents discovered $45,500 worth of expensive watches and jewelry in the

course of the search.[60]

  At trial, the Government introduced testimony from cooperating witnesses not charged in

this case regarding Jones's involvement in a prior conspiracy to ship cocaine to Philadelphia

through Federal Express by using stolen corporate accounts and false names.  This evidence was

admitted for the limited purpose of establishing that Jones had knowledge and intent to commit

the charged offenses, and as evidence of a common scheme.  The witnesses testified that from

the summer of 2005 until March 2006, they had arranged for cocaine to be shipped in Federal

Express boxes and had used an apartment on Henry Avenue in Philadelphia to store and break

down the drugs.[61]  One of these witnesses also testified that he often sold Federal Express parcels

of cocaine to Jones during this same time frame and that Jones frequently stopped by the Henry

Avenue apartment to pick up the packages of cocaine.[62]  The jury also heard testimony from one

---

[57] N.T. 7/27/09 at 209-10, 214.

[58] N.T. 7/27/09 at 210-11.

[59] N.T. 7/27/09 at 216-220.

[60] N.T. 7/27/09 at 214-215; N.T. 7/28/09 at 37.

[61] N.T. 7/24/09 at 127-129, 133-40.

[62] N.T. 7/24/09 at 141-45.

of these witnesses that after Jones was arrested in this case, the two men saw each other in prison

and Jones asked whether the other cooperating witness was "snitching."[63]

## IV.    DISCUSSION

### A.    Washington's Motion for Judgment of Acquittal or New Trial

#### 1.    *Sufficiency of the Evidence*

Washington argues that a judgment of acquittal is warranted here  because "even though

the Government demonstrated that the defendants knew each other, it. . . did not prove that there

was an agreement between them" to commit the charged illegal acts.[64]  Washington contends that

the only evidence of  agreement was the uncorroborated testimony of two cooperating

Government witnesses.  However, a co-conspirator's testimony about the defendant's role and

statements may be "sufficient to allow a rational juror to conclude beyond a reasonable doubt"

that the defendant knew the object of the conspiracy was to import narcotics.[65]  Testimony of

ongoing relationships between conspirators, considered in the totality of the circumstances, may

establish participation in a conspiracy.[66]  In this case, the cooperating witnesses testified that

---

[63] N.T. 7/27/09 at 93-94.

[64] Washington's Mem. Law in Supp. Post-Trial Mot. [Document No. 382] at 3.

[65] United States v. Reyeros , 537 F.3d 270, 279 (3d Cir. 2008).

[66] See United States v. Mercado, 610 F.3d 841, 849 (3d Cir. 2010) ("We hold that a defendant's presence on multiple occasions during critical moments of drug transactions may, when considered in light of the totality of the circumstances, support an inference of the defendant's participation in the criminal activity."); United States v. Thomas, 379 F. App'x 262, 266 (3d Cir. 2010) (affirming the district court's denial of defendant's motion for judgment of acquittal of his conviction for conspiracy to smuggle drugs, where the defendant on multiple occasions delivered to his co-conspirator a suitcase filled with cocaine as well as cash, and alerted his co-conspirator when the cocaine arrived at its destination); United States v. Powell, 113 F.3d 464, 467 (3d Cir. 1997) (holding that there was substantial evidence to affirm defendant's conviction for conspiracy to distribute cocaine, including evidence that his brother and co-conspirator consulted him as to the sales price; they lived together, shared packaging supplies, and

Washington coordinated the shipments and actually handled the cocaine, breaking it down into smaller packages.  If believed, this testimony established Washington's role in the conspiracy.  It was for the jury to determine the credibility of the cooperating witnesses.[67]

Next, Washington argues that although the Government introduced cell phone calls between the defendants, the calls were not recorded and the calls, therefore, were not evidence of conspiracy.  The jury, however, was entitled to consider that cell phone calls were made around the time that the parcels were delivered to the UPS store on February 7, 2007, after which Washington surveilled the area, met the taxi at Second and Lombard Streets after the taxi's passenger picked up the parcels, and then drove off, with the taxi and its cargo following for several miles; the fact of the phone calls formed part of the chain of evidence.[68]

Washington also argues that the Government witness who helped to apply for the UPS mailboxes was unable to identify Washington in the courtroom or in a photograph presented to her in court.[69]  The witness testified that she had been able to identify Washington in a photograph shown to her at the grand jury proceeding years before, but because of the passage of time she could not as easily identify him at the trial.[70]  The jury was entitled to conclude that her memory was more accurate at the time of the grand jury proceedings.

---

supplied each other with cocaine to sell; and the defendant admitted to distributing cocaine on a daily basis); United States v. Leon, 739 F.2d 885, 892–93 (3d Cir. 1984) (affirming an aiding and abetting conviction where the evidence established the defendant's *repeated* presence at and proximity to the location where a large quantity of drugs was being unloaded).

[67] See Mercado, 610 F.3d at 845.

[68] See id. at 848 (holding that jurors are only restricted from inferring that a "defendant gained knowledge of the subject of an illegal conspiracy based on the existence of a call alone").

[69] Washington's Mem. Law Supp. Post-Trial Mot. at 4.

[70] N.T. 7/24/09 at 233.

Additionally, Washington argues that the Government failed to produce enough evidence showing that he had the intent to distribute cocaine or had made a substantial step toward that end.  Detective King, who conducted surveillance on the date of Washington's arrest, testified as to Washington's careful study of the area around the UPS Store and the fact that Washington's Buick led the drug-carrying taxi to another location.[71]  Cooperating witnesses testified that Washington coordinated the opening of mailboxes and cocaine pick-ups from UPS Stores for nearly nine months prior to his arrest, including the pick-up on February 7, 2007.  This testimony was corroborated by the UPS, Alamo car rental, and cellular phone records admitted at the trial. Drawing all reasonable inferences in support of the jury's verdict and viewing the evidence in a light most favorable to the Government, the direct and circumstantial evidence at trial supported the jury's guilty verdict for both Counts One and Two.

### 2.     Testimony About the Earlier Conspiracy

Washington argues that the Court erred in permitting the Government to introduce testimony from cooperating witnesses about Jones's earlier involvement in shipping cocaine through Federal Express.  Washington asserts that the prior uncharged conspiracy did not prove knowledge, intent, or a common scheme or plan as to the later conspiracy, because there was no evidence that he was involved with the prior conspiracy and the witnesses' testimony had nothing to do with the charged conspiracy.  Washington further asserts that admission of this prior conspiracy evidence prevented the jury from making a reliable judgment about guilt or innocence.

---

[71] N.T. 7/24/09 at 89.

The Court admitted the evidence pursuant to Federal Rule of Evidence 404(b).[72] Evidence of prior bad acts may be admitted if it is logically relevant to any issue other than the defendant's propensity to commit the charged crime.[73]  If it is relevant, a court must determine whether under Federal Rule of Evidence 403, the probative value of the evidence outweighs its prejudicial effect.[74]  Once admitted, a limiting instruction serves to eliminate any potential for unfair prejudice and should ensure that the jury does not consider the evidence for an improper purpose.[75]

Before trial, the Government sought to admit, and Defendants to exclude, evidence of the prior conspiracy.  After considering the evidence, and weighing its probative value against its prejudicial effect, the Court held in a June 30, 2009, Memorandum Opinion that the Government would be permitted to introduce testimony regarding Jones's involvement in the prior conspiracy for the limited purposes of establishing that Jones had knowledge and intent, and as evidence of a common scheme.[76]  The evidence was admitted as to Jones only and the jury was given a specific

---

[72] Rule 404(b) provides in relevant part that:

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses; Notice in a Criminal Case. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

[73] See United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992).

[74] Id.

[75] See United States v. Sriyuth, 98 F.3d 739, 748 (3d Cir. 1996).  See also United States v. Givan, 320 F3d. 452, 462 (3d Cir. 2003) (preclusion of evidence admissible under Rule 404(b) simply because of a concern that jurors will not be able to follow the court's instructions regarding its use would inevitably severely limit the scope of evidence).

[76] Memorandum Opinion and Order (June 30, 2009) [Document No. 286].

limiting instruction to this effect:

> I may allow evidence, testimony or exhibits for a limited purpose and you must follow that instruction.. . . . And I, with great caution, want you to follow my instructions, and this limited purpose for which you will be hearing testimony right now. . . is only for the Government to establish proof of knowledge of the manner of packaging and shipping illegal drugs by Mr. Jones. . . . [I]t does not, and it is not offered as proof of any evidence against either Mr. Washington or Mr. Crawford. . . . That's the limitations for which you may apply it . . . and it's not considered against either of the other co-defendants. . . .[77]

In the jury charge, the Court again reminded the jury of the limiting instruction: "You may not consider this evidence [of the earlier conspiracy] against any other defendant. I highlight that. I think I told you that before, and I'm repeating it now."[78]  A jury is presumed to have followed the instructions the Court gave it.[79]  But a presumption is unnecessary here:  The fact that the jury found co-defendant Crawford not guilty on all counts establishes that the jury was able to evaluate the evidence against each defendant separately.

### 3.    Severance of Washington's Trial from Jones's Trial

Washington also argues that given the prejudicial nature of the prior conspiracy evidence, and the lack of evidence that Washington, his trial should have been severed from Jones's pursuant to Federal Rule of Criminal Procedure 14(a), after the Court granted the Government's

---

[77] N.T. 7/22/09 at 14; N.T. 7/24/09 at 121-22; N.T. 7/27/09 at 78-80.  Because the evidence was admitted only as to Jones, Washington's contention that he was willing to stipulate that the Government did not need to prove the elements of knowledge and intent is irrelevant.

[78] N.T. 7/30/09 at 86-87.  See also N.T. 7/30/09 at 68 ("You also heard evidence that other witnesses made cooperation plea agreements with the Government. . . . Their testimony was received in evidence and may be considered by you but  for limited purposes only."). In closing arguments, counsel for the Government also reminded the jury that evidence relating to the Federal Express cocaine shipments was to be used only against Jones, and not against Washington or Crawford.  N.T. 7/29/09 at 180.

[79] Givan, 320 F.3d at 462.

16

404(b) motion.[80]   However, Washington did not move to sever his trial after the Court granted the

Government's 404(b) motion.  Earlier  in the proceedings, on September 12, 2008, Washington

had moved to sever his trial from co-defendants Gregory Jones and Ronald Crawford in order to

enforce his right to a speedy trial; that motion was denied.[81]  Washington did not renew the

motion to sever after the Court granted the Government's motion.  Thus, this argument was

waived.

Furthermore, severance was not warranted.  "To prevail on a Rule 14 motion, a defendant

must pinpoint clear and substantial prejudice resulting in an unfair trial.  As a result, a defendant

is not entitled to a severance merely because evidence against a co-defendant is more damaging

than the evidence against the moving party.  Instead, the question of prejudice hinges upon

whether the jury will be able to compartmentalize the evidence as it relates to separate defendants

in view of its volume and limited admissibility."[82]  Washington has not met his burden of showing

that a failure to sever clearly and substantially prejudiced him to the point of depriving him of a

fair trial; the jury received appropriate limiting instructions and, as the acquittal of Crawford

demonstrates, was able to evaluate the evidence against each defendant separately.[83]

---

[80] Rule 14(a) provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the Government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

[81] See Document No. 169.

[82] United States v. Walker, 657 F.3d 160, 170 (3d Cir. 2011) (internal quotations omitted).

[83] See United States v. Salehi, 187 F. App'x 157, 164 (3d Cir. 2006).

**B. *Jones's Motion for Acquittal or New Trial***

In his post-trial motion, Jones raises the same arguments made in the context of the pre-trial motions to admit or suppress evidence, contending that the Court erred by allowing evidence seized and statements made during his arrest to be admitted at trial.  Jones further contends that the Court erred by granting the Government's motions *in limine*, resulting in the jury receiving confusing evidence that focused on Jones's alleged involvement with drugs both before and after the charged conspiracy.  Before trial, the Court held hearings and issued rulings on these motions.[84]  The Court incorporates its prior rulings into this ruling on the post-trial motions, and will not repeat its findings here.  The Court also has considered the disputed evidence in the context of the trial, and concludes that the evidence was properly admitted.

### 1. *Physical Evidence Seized*

Jones argues, as he did before trial, that the Government should have been precluded from introducing evidence seized during Jones's arrest because he did not consent to a search of the Mullica Hill, New Jersey residence.  Jones has not raised any new arguments that would cause the Court to reconsider its finding that Jones orally consented to the search.

Jones also argues that the evidence was inadmissible pursuant to Federal Rules of Evidence 404(b) and 403, because the items recovered by the federal agents approximately eighteen months after termination of the charged conspiracy had no probative value  in establishing Jones's knowledge and intent with regard to his participation in the conspiracy.  The Court disagrees.  In considering the admissibility of contested evidence, the Court must first decide whether a Rule 404(b) analysis is necessary.  Rule 404(b) "proscribes the admission of

---

[84] See, e.g., Document Nos. 239; 274; 276; 284; 285; 286; 287.

18

evidence of other crimes when offered to prove bad character."[85]  However, "the prohibition of 404(b) is not invoked if the evidence is offered as direct proof of the crime charged."[86]

At trial, the Court allowed the Government to introduce the fact that law enforcement agents recovered approximately $85,400 in cash and  $45,000 in jewelry, because it was offered as evidence of the proceeds of the charged drug trafficking conspiracy.  The greeting cards, along with their envelopes, were admitted to establish Jones's possession and use of the home in Mullica Hill and his ownership of the money found in space above the master bedroom closet. The evidence of business cards for three car rental locations and a commercial shipping depot was relevant to Jones's involvement in the conspiracy, because the conduct charged involved shipping drugs to commercial shipping depots and retrieving them with the use of rental cars.[87]  The recovered physical evidence was inextricably intertwined with the charged drug trafficking conspiracy and therefore admissible.  Having presided over the trial, the Court reaffirms its pretrial determination that these items were introduced as evidence of the conduct actually charged, and not as evidence of other illegal acts.

It is well-settled in this Circuit that where a defendant is on trial for a crime in which pecuniary gain is the usual motive, evidence of the sudden, inexplicable acquisition of wealth by the defendant is admissible.[88]  This is true even if the source of such wealth cannot be connected

---

[85] United States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999).

[86] United States v. Stewart, 325 F. Supp. 2d 474, 493 (D. Del. 2004) (citing Givan, 320 F.3d at 463).

[87] See Memorandum Opinion and Order (June 26, 2009) [Document No. 284] at 8.

[88] See United States v. Hall, 44 F. App'x 532, 535 (3d Cir. 2002). See also United States v. Chaney, 446 F.2d 571, 575 (3d Cir. 1971) (quoting United States v. Howell, 240 F.2d 149, 158 (3d Cir. 1956)).

directly to the charged conduct.[89]  In the June 26 Opinion, the Court found that the cash and jewelry were discovered close enough in time to the charged conduct to suggest that they were the fruits of the charged offenses.[90]  The evidence at trial established that Jones was the leader of a conspiracy that brought more than 150 kilograms of cocaine to Philadelphia during a nine-month period.  It is undisputed that approximately eighteen months after the conspiracy ended, agents found Jones in possession of unexplained wealth in the form of approximately $85,400 in cash and approximately $45,000 in jewelry.  As the Court determined before trial, the elapsed time between the charged conspiracy and the discovery of Jones's unexplained wealth when arrested was not so great as to destroy the nexus between the two.[91]

In a related argument, Jones contends that the Court erred in permitting the Government to elicit testimony from one of the cooperating witnesses that, while in custody together, Jones told the witness that the arresting agents took "some money from him and a watch."[92]  Jones argues that this testimony improperly commented on items that had been secured in violation of his Fourth Amendment rights.  As the Court held in its earlier ruling, the statement was admissible as evidence of Jones's proprietary interest in the items seized from the Mullica Hill residence, and his Fourth Amendment rights were not violated in the seizure of this evidence.[93]

---

[89] See United States v. Cooley, 131 F. App'x 881, 883 (3d Cir. 2005) (citing United States v. Chandler, 326 F.3d 210, 215 (3d Cir. 2003) (a defendant's access to unexplained or unaccounted for wealth is strong circumstantial evidence of involvement in illegal activity)).

[90] See Memorandum Opinion and Order (June 26, 2009) [Document No. 284] at 8.

[91] Id. at 9-10.

[92] N.T. 7/27/09 at 93-94.

[93] Memorandum Opinion and Order (June 30, 2009) [Document No. 286] at 5.

2.     *Post-Arrest Statement of Unemployment*

At the time of his arrest, Jones told the arresting agents that he was not employed.  Jones argues that the statement was obtained in violation of his rights pursuant to <u>Miranda v. Arizona</u>,[94] and should have been suppressed and inadmissible at trial.  The Court, however, determined in its pre-trial rulings that Agent Turner asked Jones, as a courtesy during his arrest, whether he needed to notify an employer that he would not be at work for a few days, to which Jones could have simply answered "No."[95]  Instead, Jones voluntarily admitted that he was unemployed.  Agent Turner's question was not in violation of Jones's <u>Miranda</u> rights because the question was not "reasonably likely to elicit an incriminating response."[96]  The statement also was relevant as evidence that the money and expensive jewelry found at the residence were not from a legitimate source, from which the jury could draw the reasonable inference that they were proceeds from the charged conspiracy.  The Court also notes that despite his apparent wealth, Jones stipulated at trial that he filed no tax returns for the years 2006-2008.  The Court finds that the admission of Jones's statement was not unduly prejudicial.

3.     *Evidence of Telephone Calls*

Jones contends that the Court erred "by permitting the jury to receive the Government's summarized report of the phone records which extrapolated only those phone numbers alleged to belong to Jones and his co-defendants" and "by denying Jones's request to provide the jury with

---

[94] 384 U.S. 436 (1966).

[95] Findings of Fact and Conclusions of Law (June 12, 2009) [Document No. 275] at 7.

[96] <u>See</u> <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).

co-defendant Washington's telephone and its contact information."[97]  Jones, however, failed to provide the Court with any argument to support these contentions.  To the extent that Jones objects to the summaries of cell phone records admitted into evidence, Agent Turner testified as to how the summaries were prepared, and the underlying phone records were admitted as exhibits.[98] To the extent that Jones objects to the fact that one summary was provided to the jury at the jury's request,[99] the Court notes that the underlying phone records, as well as the subscriber information for the phones, also were provided to the jury.[100]  The phones themselves were not provided to the jury, as it was not known whether they were charged or operable, or whether there was information on the phones that was not admitted into evidence.[101]  Jones has not explained how this constitutes prejudicial error.[102]

4.      *Testimony About the Earlier Conspiracy*

Jones argues that testimony by the cooperating witnesses about the prior conspiracy should have been precluded as "propensity evidence" on the basis that "the Government did not possess any evidence other than the uncorroborated word of two convicted felons who maintain that they taught Jones how to utilize shipping carriers to transport packages of narcotics."[103]  However,

---

[97] Jones's Post-Trial Motion at 1.

[98] N.T. 7/27/09 at 185-205.

[99] N.T. 7/30/09 at 108-09.

[100] N.T. 7/30/09 at 109-10.

[101] N.T. 7/30/09 at 108-12.

[102] Jones also argues that fifteen cell phones seized at the Mullica Hill residence were inadmissible.  As the Court denied the Government's motion in limine to introduce those cell phones into evidence, they were not in fact admitted.

[103] Id. at 9.

evidence of prior bad acts may be admitted, as it was here, for the purpose of demonstrating a defendant's knowledge in the later offense with which he is charged.[104]  It is well established that the probative value of Rule 404(b) evidence is particularly high "when the charged offense involves a conspiracy."[105]

The evidence of the prior conspiracy was relevant to proving Jones's knowledge of the drug-shipping method, as well as his intent and a common plan to execute a similar drug-trafficking operation. The cooperating witnesses testified that Jones participating in shipping money and receiving parcels of cocaine using Federal Express under false names.[106]  Evidence of Jones's participation in a prior, uncharged drug conspiracy with many similarities to the charged conspiracy was relevant as it made Jones's participation in the charged conspiracy more likely. For substantially the reasons stated in its Memorandum and Order of June 30, 2009, the Court concludes that the evidence was not unduly prejudicial, nor so distracting or confusing as to violate Rule 403.[107]

As noted above, the Court gave the jury a limiting instruction before the witnesses testified:

> [W]ith great caution, I want you to follow my instructions, and this limited purpose for which you will be hearing testimony right now  . . . is only for the Government to establish proof of knowledge of the manner of packaging and shipping illegal drugs by Mr. Jones.  It is not to be considered proof of Mr. Jones's membership in a conspiracy, this charged conspiracy, or any prior

---

[104] See United States v. Vega 285 F.3d 256, 261 (3d Cir. 2002).

[105] United States v. Cross, 308 F.3d 308, 324 (3d Cir. 2002).

[106] See, e.g., N.T. 7/24/09 at 142-44.

[107] Memorandum Opinion and Order (June 30, 2009) [Document No. 286] at 7-12.

conspiracy. . . .[108]

In the final charge to the jury, the Court again reminded the jurors of the appropriate, limited use of this testimony:

> You also heard testimony that one defendant, Gregory Jones, was previously involved in the use of Federal Express, a commercial mail carrier, and false sender and recipient information to ship cocaine.  This evidence of other acts was admitted only for a limited purpose.  You may only consider this evidence for the purpose of deciding whether Gregory Jones possessed knowledge of and/or acted with a similar method of operation in using UPS, a commercial mail carrier, and false sender and recipient information to ship cocaine into Philadelphia in this case. Do not consider this evidence for any other purpose. You may not consider this evidence against any other defendant.  I highlight that.  I think I told you that before, and I'm repeating it now.[109]

These instructions eliminated any potential for unfair prejudice and ensured that the jury did not consider the evidence for an improper purpose.[110]  The jury is presumed to have followed the instructions, and potential prejudice was outweighed by its probative value.


**V.    CONCLUSION**

After careful consideration of all of the arguments raised by Jones and Washington, the Court is satisfied that Defendants received a fair trial and that evidence was properly admitted and sufficient to sustain the convictions.  The motions for judgment of acquittal or a new trial will be denied.

An appropriate Order will be entered.

---

[108] N.T. 7/24/09 at 121-22.  See also N.T. 7/24/09 at 79-80.

[109] N.T. 7/30/09 at 86-87.

[110] Sriyuth, 98 F.3d at 748.